**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BEVERLY M. HARRIS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 11-1902 (CKK) |
| | : |
| ERIC H. HOLDER, JR., *et al.*, | : |
| | : |
| Defendants. | : |

**MEMORANDUM OPINION**

This matter is before the Court on Defendants' Motion to Dismiss Amended Complaint.[1] For the reasons discussed below, the motion will be granted.

I.  BACKGROUND

Plaintiff, who describes herself as "a Compensated Disabled Veteran of the United States Air Force, an Air Traffic Controller, an Aerospace Engineer, a Federal Government Contract Specialist, and a former University Professor," Am. Compl. ¶ 14, served approximately 10 years in the Air Force prior to accepting a position "on September 9, 2002 to work as a Contract Specialist with the Air Force's 89 Contracting Squadron at Andrews Air Force Base" in Maryland, *id.* ¶ 26.  The Air Force had awarded plaintiff a recruitment bonus of $9,400 in light of her engineering experience.  *Id.* ¶ 27.  She soon learned that a manager, Ellen Siozon, "was responsible for her receiving the recruitment bonus," and within months Ms. Siozon "was

---

[1] Also before the Court are Plaintiff's Motions for Relief from Wiretapping and Monitoring of Telephones, Computer, and Person [Dkt. #6, 33], which will be denied, and Plaintiff's Motion to Withdraw Jury Trial Demand from Plaintiff's Amended Complaint [Dkt. #22] and Motion to Withdraw Plaintiff's Motion for Relief from Wiretapping of Plaintiff's Telephones, Computer, and Person [Dkt. #31], which will be granted.

1

demanding funds from the recruitment bonus and making threats of firing [plaintiff]" if she did not pay a kickback. *Id.* "Reluctantly [plaintiff] gave . . . Siozon $2,000 in cash as . . . requested," only to have Ms. Siozon demand additional funds. *Id.* Plaintiff apprised the Air Force Office of Special Investigation ("AFOSI") of the situation, and AFOSI in conjunction with the Federal Bureau of Investigation ("FBI") "launched an investigation" during which plaintiff was asked "to work with them []undercover" by wearing a recording device. *Id.* AFOSI and FBI agents arrested Ms. Siozon in September 2003, *id.*, and "[t]he government tried the extortion case to the Baltimore Federal Court . . . in 2004," *id.* ¶ 3. Plaintiff testified at the trial. *See* Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("Defs.' Mem.") at 2 n.4. The government "lost the case," and the individual who informed plaintiff of the outcome of the trial "was noticeably disappointed, seem[ed] very unsatisfied and bitter based on the tone of voice," in plaintiff's estimation. Am. Compl. ¶ 3.

Plaintiff's participation in the Siozon matter apparently was the origin of her subsequent woes, all of which she attributes to the United States Attorney General and his subordinates who, "[t]o achieve their political and public relation goals and public image," have "trampled on [plaintiff's] constitutional rights and their own rules. *Id.* ¶ 4.

According to plaintiff, the United States Department of Justice ("DOJ") and the FBI, in violation of the Privacy Act, *see* 5 U.S.C. § 552a(b), "intentionally and willfully have disclosed records kept by the agencies pertaining to [plaintiff] in order to falsely implicate [her] and convey the false impression that the agencies was [sic] investigating [her] for some type of illegal acts," *id.* ¶ 30. In addition, defendants also violated 28 C.F.R. § 50.2, a regulation intended "to prevent political pressures from encouraging agents to publicly smear a presumptively innocent, uncharged person like [her]." Am. Compl. ¶ 31; *see id.* ¶¶ 32-33.

2

These unlawful disclosures allegedly occurred over the course of seven years, *see id.* ¶¶ 7, 47, and have resulted in plaintiff's continued unemployment "even though she has applied for more than 300 federal government jobs and more than 50 jobs with civilian companies," *id.* ¶ 43. Plaintiff "believes that the FBI . . . [has] been 'blacklisting' her and disseminating false and defamatory information to prospective employees." *Id.* ¶ 47. The Attorney General and his subordinates allegedly are "providing to former employers, future employers, friends, family, business associates (including mortgage holder), neighbors, and local enforcement agencies scores of anonymous leaks detailing . . . the events of the extortion investigation at Andrews Air Force Base and the trial in Baltimore." *Id.* 9.a. (emphasis removed). Among the alleged disclosures is "defamatory and false information about subjective observations about [plaintiff's] character." *Id.* The dissemination of "[f]alse and defamatory information . . . attacking her character, and implicating her without evidence have prevented her from obtaining . . . employment in her field of contracting, air traffic control, and aerospace engineering." [2] *Id.* ¶

---

[2]  On May 30, 2004, plaintiff took a job as a Contract Specialist with the General Services Administration ("GSA") in Boston, Massachusetts. Am. Compl. ¶ 36. In September 2004, plaintiff "was terminated with no reason/cause given and no due process of pre-termination defense." *Id.* "Her next position, as a Contract Specialist with the Port Authority of New York, lasted only from March 2007 until her termination in September 2007. *Id.* ¶ 37. Neither a reason for her termination nor "due process for pre-termination defense was offered" to her. *Id.* Plaintiff returned to her native Texas, and in September 2007 she "was hired by L-3 Communication (IS) in Waco Texas . . . as a Principal Program Schedule & Cost Analyst on the US Navy EP-3E MRO program." *Id.* ¶ 38. She was "terminated on December 20, 2008 once again with no pre-termination due process." *Id.* Plaintiff's career path led her to Iraq in January 2009, when she took a position "with KBR, Inc. as an Air Traffic Controller at Camp Delta," only to be terminated on June 25, 2009. *Id.* ¶ 40.

   Plaintiff's last employment, as a Contract Specialist assigned to a United States Army Area Support Group ("ARG") in Kuwait, began in September 2009. *Id.* ¶ 41. Her "exceptional" performance, however, "was overshallowed [sic] by the false and defamatory information from FBI employee(s)" who caused plaintiff to suffer "inhumane, disrespectful, and unfair treatment and abuse from management." *Id.* At this point, plaintiff "contacted . . . FBI Special Agent . . . Miceli on November 23, 2010, after receiving" a memorandum regarding her proposed termination. *Id.* ¶ 42. According to plaintiff, Special Agent Miceli told her that he

3

61. She deems this a violation of her "Fifth Amendment rights to liberty and property without due process of law." *Id.* ¶ 59.

To further this effort, the FBI allegedly is "monitoring her telephone and computer," and in some cases, the agency has intercepted email messages between plaintiff and prospective employers. *Id.* ¶ 47. Plaintiff alleges that, even though she "changed her telephone number six . . . times between July 2011 and September 2011, changed her e-mail address twice, and created 3 other free e-mail accounts, the FBI found the changes and continued to monitor them all." *Id.* ¶ 48. In addition, since April 2004 "electronic eavesdropping equipment" has been installed "on her private residence phone line and on her personal computers" for the "sole purpose" of "harass[ing her] by invading the most personal and private sphere of her life." *Id.* ¶ 9.b. Surveillance is not always hidden. According to plaintiff the "so-called []surveillance [is] so overt, extensive, and intrusive as to constitute deliberate harassment," and defendants have gone so far as enlisting the assistance of Harris County, Texas officers "who are constantly parking in front of [plaintiff's] home," resulting in her "mental home arrest." *Id.* ¶ 9.c.

---

"would relocate her," but in making the request he told others "a completely different story and one that defamed her reputation." *Id.* In addition, during this time period Special Agent Miceli allegedly "asked [plaintiff] to go undercover with the FBI on Army contracts[] corruption[]," a request to which she "reluctantly agreed knowing that her phones (business and private) and computers (business and private) were being monitored." *Id.* She also "was being followed on a daily basis by the Army investigative staff." *Id.* Plaintiff ultimately "decided not to participate" in an investigation, *id.*, a decision which allegedly resulted in "stepped up . . . efforts to marginalize and discredit her." *Id.* ¶ 44.

According to plaintiff, she applied for positions with, but was not hired by, the Defense Logistics Agency, USAID, the Departments of State, Education, Homeland Security, Housing and Urban Development, ARAMCO Services, KBR, Inc., Marathon Oil, and other federal agencies and private corporations. *See* Am. Compl. ¶ 47. In some cases, according to plaintiff, she was unable to communicate with prospective employers because of the FBI intercepted email messages. *See id.*

When plaintiff sought "to clear her name publicly and to bring light to the government's abuses . . . [t]hey sought to chill any future efforts by [plaintiff] to speak out, defend herself, or complaint [sic]." *Id.* ¶ 44. These actions allegedly violated her "First Amendment right to free speech and to petition her government for redress of grievances."[3] *Id.* Even after returning to Texas from her last place of employment overseas, "federal agents increased the intensity of their 'surveillance' of [plaintiff]." *Id.* ¶ 46. For example, she asserts that local law enforcement officers, at defendants' behest, "park in front of her house, stop[] all friends, family, and business associates (including lawn maintenance individual) and harass them as well as record[] their license plates." *Id.* According to plaintiff, "the constant, in-your-face government presence was designed to intimidate, punish and harass [her] for availing herself of her First Amendment rights and chill any future plans to exercise those rights." *Id.*

For these alleged violations of rights protected by the First and Fifth Amendments to the United States Constitution, and for alleged violations of the Privacy Act and 28 C.F.R. § 50.2, plaintiff demands a declaratory judgment, injunctive relief, and unspecified compensatory, exemplary and punitive damages, among other relief. *Id.* at 36 (Prayer for Relief).

---

[3]     Plaintiff apparently petitioned the government for redress of her grievances by expressing her concerns to DOJ officials and FBI Special Agents. *See* Am. Compl. ¶¶ 42. 49. For example, "[i]n the spring of 2010," plaintiff "sent a complaint to the DOJ Office of Special Counsel . . . regarding the violation of her civil right by her management with the U.S. Army," only to have defendant Giaccio "dismiss[] the complaint and state[] that 'Fifth Amendment right to self-incrimination is only used in a court's proceedings['] but that was not what the complaint was about." *Id.* ¶ 49.a. In November 2010, plaintiff "went to the FBI Office at Camp Arifjan Kuwait for assistance," but defendant Miceli offered none. *Id.* ¶ 49.b. Her next attempt occurred in June 2011, when plaintiff sent a letter to defendant Bookstein, FBI Ombudsman, "requesting an explanation as to why FBI has been dissemination [sic] false and defamatory information about her, and what did she do to warrant the FBI interference in her life." *Id.* ¶ 49.c. Neither this letter nor the copies she sent to defendants Kelley, Kelly, Mueller, or the DOJ's Civil Rights Division triggered a response. *Id.* ¶ 49.c. – 49.f. When she went to the FBI's Washington, D.C. headquarters office on September 9, 2011, she was refused entry. *Id.* ¶ 49.g.

5

II.  DISCUSSION

In addition to the FBI and the DOJ, *see* Am. Compl. ¶¶ 24-25, plaintiff brings this action against United States Attorney General Eric Holder, Jr., FBI Director Robert Mueller, FBI Special Agents Gregorio Miceli, Patrick Kelley, Stephen Kelly, and Monique Bookstein, the DOJ's Inspector General, unknown FBI Special Agents and DOJ employees, and Gregory Giaccio, in both their official and individual capacities, *id.* ¶¶ 15, 17-23.  Defendants move to dismiss the amended complaint on several grounds, arguing primarily that the pleading fails to state claims upon which relief can be granted. [4]  *See generally* Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("Def.'s Mem.") at 12-37.

*A.  Dismissal Under Rule 12(b)(6)*

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  Rule 12(b)(6) tests the legal sufficiency of a complaint.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In considering such a motion, the "complaint is construed liberally in the plaintiff['s] favor, and [the Court] grant[s] plaintiff[] the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Comm'cns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citation

---

[4] For purposes of this Memorandum Opinion, the Court presumes, without deciding, that service of process was effected properly, that this Court may exercise personal jurisdiction over defendant, and that venue in this district is proper.  Accordingly, the Court does not address defendant's arguments, *see generally* Def.'s Mem. at 3-12, for dismissal of the complaint under Rule 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(3) for improper venue, under Rule 12(b)(4) for insufficient process, and under and 12(b)(5) for insufficient service of process.

omitted).   However, "the [C]ourt need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Id.*  The Court need not accept "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks, brackets and citation omitted); *see Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de Puerto Rico*, 621 F.3d 10, 14 (1st Cir. 2010) (stating that *Twombly* and *Iqbal* standards require the court to "screen[] out rhetoric masquerading as litigation").

The complaint must do more than set forth than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570).   A claim is facially plausible when the pleaded factual content "allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal quotation marks and citation omitted).

### B.  Official Capacity Claims

Plaintiff brings her claims for injunctive and declaratory relief against the individual defendants in their both their individual and official capacities.  *See* Am. Compl. ¶¶ 64, 68, and 76.  To the extent that she also may intend to bring any claim for damages against either these defendants in their official capacities or against a federal government agency, the claims are

7

barred under the doctrine of sovereign immunity.  A suit against a federal official in his official capacity is treated as a suit against the government itself.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  Such consent may not be implied, but must be "unequivocally expressed." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992).  The United States has not waived its sovereign immunity for constitutional tort claims.  *See Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 477 (1994) (stating that sovereign immunity precludes damage claims against the United States government for constitutional violations brought under the Federal Tort Claims Act).  In addition, sovereign immunity extends to governmental agencies such as the DOJ and to their employees where such employees are sued in their official capacities.  *See id.* at 483-86.  "Sovereign immunity is jurisdictional in nature," *id.* at 475, and absent a waiver of sovereign immunity, the court lacks subject matter jurisdiction to entertain plaintiff's claims for money damages against the FBI, the DOJ, or against the federal government officials sued in their official capacities.  *See id.*; *Clark v. Library of Congress*, 750 F.2d 89, 101-02 (D.C. Cir. 1984); *Meyer v. Reno*, 911 F. Supp. 11, 18 (D.D.C. 1996).

*C.  Individual Capacity Claims*

1. The Complaint Fails to State *Bivens* Claims Upon Which Relief Can Be Granted

Plaintiff brings this action in part under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against the individual defendants in their individual capacities, *see* Am. Compl. ¶¶ 64, 68 and 76.  "A *Bivens* action is the federal analog to suits

brought against state officials under . . . 42 U.S.C. § 1983."[5] *Marshall v. Fed. Bureau of Prisons*, 518 F. Supp. 2d 190, 193 (D.D.C. 2007) (citing *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006) (internal citation omitted)).  Under *Bivens*, a plaintiff has "an implied private action for damages against federal officers alleged to have violated [her] constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  Critical to a *Bivens* claim is an allegation "that the defendant federal official was personally involved in the illegal conduct." *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997); *Voinche v. Obama*, 744 F. Supp. 2d 165, 177 (D.D.C. 2010).  The individual defendants move to dismiss plaintiff's *Bivens* claims first because the "allegations against Defendants Holder, Mueller, Giaccio, Kelly, Kelley, Bookstein, [and the DOJ's Inspector General] are all based on their roles as heads of agency components, their failure to respond to letters from Plaintiff or (as with allegations against defendant Miceli) fanciful claims of some broad but unsupported conspiracy."  Defs.' Mem. at 13-14.

However weak, vague and unsupported the allegations may be, plaintiff manages to allege the Attorney General's personal involvement in coordinated efforts to "intentionally trample[] on[plaintiff's] constitutional rights" by effecting her termination from six jobs, Am. Compl. ¶ 4; *see id.* ¶¶ 63, 67, and by "fail[ing] to eliminate, condemn, or seriously investigate the violations," *id.* ¶ 6.  Her assertion that the remaining defendants participated in this activity, *id.* ¶ 7; *see id.* ¶¶ 59, 63, 67, is weaker still.  These meager accomplishments are meaningless,

---

[5] "To state a claim under [42 U.S.C. §] 1983, a plaintiff must allege both (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendant acted under color of the law of a state, territory or the District of Columbia." *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir.1991) (internal quotation marks omitted).

however, in light of the critical deficiency of plaintiff's complaint: its utter failure to support its broad assertions of constitutional violations with factual allegations.

Plaintiff's complaint is replete with her own opinions and beliefs, labels and legal conclusions; it offers few, if any, facts which might even remotely support her claims. For example, plaintiff alleges that defendants took steps "to chill any future efforts by [plaintiff] to speak out, defend herself, or complaint [sic]," in violation of her "First Amendment right to free speech and to petition her government for the redress of grievances," Am. Compl. ¶ 44, yet she fails to indicate the matter about which she was speaking, who among the defendants committed the alleged violation, or the activities from which she refrained as a result of defendants' conduct. Similarly, plaintiff broadly alleges the existence of "illegal defamation of character campaign waged by the FBI," *id.* ¶ 47, without alleging any facts tending to link particular defendants' conduct to plaintiff's unsuccessful search for employment or to any other harm allegedly resulting therefrom. And her allegations of conspiracy, surveillance, and belief "that the DOJ and the FBI encouraged her mortgage company . . . to wrongfully forclose[] on her house [in] Cypress, Texas," *Id.* ¶ 50, qualify as "patently insubstantial." *Tooley v. Napolitano*, 586 F.3d 1006, 1010 (D.C. Cir. 2009). In short, plaintiff's complaint is exactly the type of pleading that *Twombly* and *Iqbal* are intended to address. *See Anders v. Dolgencorp, LLC*, No. 5:11 CV 2098, 2011 WL 6338837, at *3 (N.D. Ohio Dec. 19, 2011) (finding that complaint which "provides no additional facts" to support a claim for intentional infliction of emotional distress under Ohio law "is precisely the type of pleading that *Twombly* and *Iqbal* addressed as insufficient"); *Watson v. V.A. Hosp.*, No. 3:09-1140, 2010 WL 3907336, at *1 (M.D. Tenn. Aug. 27, 2010) (recommending dismissal of complaint where "Plaintiff has provided absolutely no facts," and instead "simply sued Defendant for 'violation' of a federal statute and 'violations' of

a number of state statutes," while "provid[ing] no facts whatsoever to support these legal allegations and conclusions"), *adopted*, 2010 WL 3878916 (M.D. Tenn. Sept. 29, 2010). This complaint is subject to dismissal because it simply "has not nudged [plaintiff's] claims . . . across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 678 (brackets, internal quotation marks and citation omitted); *see Gary v. Pa. Human Relations Comm'n*, No. 10-1844, 2012 WL 931082, at *5 (E.D. Pa. Mar. 20, 2012) (dismissing *Bivens* claim against federal employee where complaint's "allegations are . . ., at best, boilerplate allegations amounting to conclusions of law which are entirely lacking in factual substance"); *see also Kuryakyn Holdings, Inc. v. Just In Time Distrib. Co.*, 693 F. Supp. 2d 897, 903 (W.D. Wis. 2010) (noting that a claim "is implausible when it is not supported by factual allegations that address the elements of the claim") (citation omitted).

## 2. Qualified Immunity Bars Plaintiff's *Bivens* Claims

Even if plaintiff had successfully alleged *Bivens* claims against the individual defendants, qualified immunity would bar the claims. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-step analysis for resolving government officials' qualified immunity claims. First, the Court decides "whether

the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 201. If the plaintiff satisfies this first step, the Court then decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* The sequence of this analysis no longer is mandatory, and the Court may "exercise [its] sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

a. Count I: Fifth Amendment Claim

According to plaintiff, defendants "violated [her] Fifth Amendment rights to liberty and property without due process of law." Am. Compl. ¶ 59. Defendants allegedly accomplished this task by "leak[ing] false and defamatory" information to then-current and prospective employers, thus "intentionally and maliciously interfere[ing] with [plaintiff's] jobs . . . which resulted in her firing." *Id.*¶ 60. In addition, defendants allegedly "implicat[ed] her without evidence," thus preventing her from "obtaining future employment in her field of contracting, air traffic control, and aerospace engineering." *Id.* ¶ 61.

The deficiencies of the complaint are again apparent in this context. The complaint simply fails to articulate a violation of a right protected by the Fifth Amendment. There are no factual allegations to identify the particular individuals responsible, to indicate what information these defendants allegedly disclosed, to state whether the information was false, and to link the injuries plaintiff allegedly sustained to the "leaks." Furthermore, there simply is no cognizable "constitutional claim on the theory that . . . actions, undertaken with malice, deprived [plaintiff] of a 'liberty interest' secured by the Fifth Amendment to the United States Constitution" in the circumstances of this case. *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991). At most, the

individual defendants made statements which defamed plaintiff and harmed her reputation in the eyes of then-current or prospective employers. "Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Id.*

### b. Count II: First Amendment Claim

Plaintiff alleges that defendants "sought to punish and retaliate against [her] for exercise of her First Amendment rights." Am. Compl. ¶ 67. A plaintiff states a First Amendment retaliation claim when "(1) [she] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her]exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment right." *Hatfill v. Ashcroft*, 404 F. Supp. 2d 117-18 (D.D.C. 2005) (citation omitted). Even if the Court were to assume that plaintiff has a protected First Amendment interest and exercised it, her complaint includes no factual allegations to identify which of the defendants violated that interest, to specify the manner in which the alleged retaliatory acts occurred, or to describe how the alleged acts of retaliation chilled further exercise of that right. It cannot be said, for example, that defendants' actions so chilled her exercise of First Amendment rights that she refrained from contacting DOJ and FBI officials in person, *see* Am. Compl. ¶¶ 42, 49, or refrained from sending letters, *see id.* ¶ 49, or so impacted her that she could not pursue her claims in court. "Where a party can show no change in [her] behavior, [she] has quite plainly shown no chilling of [her] First Amendment right to free speech." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citation omitted).

### III. Privacy Act Claims Against the DOJ and the FBI

"The [Privacy] Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao,* 540 U.S. 614, 618 (2004). Generally, the Privacy Act prohibits an agency from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). There are twelve exceptions to this rule, however. *See* 5 U.S.C. § 552a(b)(1-12). A claim arising from the improper disclosure of information has four elements:

> 1) the disclosed information is a record contained within a system of records; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff.

*Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 44-45 (D.D.C. 2009) (quoting *Logan v. Dep't of Veterans Affairs,* 357 F. Supp. 2d 149, 154 (D.D.C. 2004)). An individual may file a lawsuit against an agency for injunctive relief and monetary damages if an improper disclosure was willful or intentional and adversely affected the individual. 5 U.S.C. § 552a(g)(1); *see Logan*, 357 F. Supp. 2d at 154.

Plaintiff "believes that [the] FBI and [the] DOJ both maintain, with respect to the Extortion investigation at Andrews Air Force Base, 2003, a 'system of records' . . . pertain[ing] to [her]," Am. Compl. ¶ 71, and have disclosed such records without her consent, *id.* ¶ 72, causing her "an adverse effect," namely the loss of employment opportunities, damage to her "personal and professional reputation," and "extreme mental and emotional distress," *id.* ¶ 73. The allegations of the complaint are so sparse and so conclusory that the Court cannot determine what information allegedly was disclosed. It is unclear whether this information is a "record," defined under the Privacy Act as "any item . . . about an individual that is maintained by an

14

agency . . . that contains [the individual's] name, or the identifying number, symbol, or other identifying particular . . . such as a finger[print] . . . or a photograph." 5 U.S.C. § 552a(a)(4). Nor can the Court determine whether the purported record is maintained in a "system of records," defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). "A system of records exists only if the information contained within the body of material is both '*retrievable* by personal identifier' and 'actually *retrieved* by personal identifier.'" *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010) (quoting *Maydak v. United States*, 363 F.3d 512, 520 (D.C. Cir. 2004)) (emphasis in original); *see Feldman v. Cent. Intelligence Agency*, 797 F. Supp. 2d 29, 41 (D.D.C. 2011) (finding that Privacy Act claim survived a Rule 12(b)(6) motion where the plaintiff identified a particular record -- the report of an investigation into discrepancies in plaintiff's claims for reimbursement of travel expenses -- alleged that the record was maintained in a system of records retrievable by plaintiff's name, and alleged that that other individuals, whom plaintiff identified by name and who had no official connection to the investigation, learned of the investigation's details). Absent from plaintiff's complaint is any allegation that the offending record "with respect to the Extortion investigation at Andrews Air Force Base, 2003", Am. Compl. ¶ 71, is "about" plaintiff or can be retrieved by plaintiff's name or other personal identifier. Here, the Court is left with nothing more than language parroting the statute which, standing alone, does not rise to the level of a cognizable Privacy Act claim.

### IV. There Is No Private Right of Action Under 28 C.F.R. § 50.2

It is the policy of the DOJ to refrain from "furnish[ing] any . . . information for the purpose of influencing the outcome of a defendant's [criminal] trial, nor shall personnel of the

[DOJ] furnish any . . . information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial." 28 C.F.R. § 50.2(b)(2). Similarly, DOJ personnel "shall not during . . . [civil] litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, which a reasonable person would expect to be disseminated by means of public communication if there is a reasonable likelihood that such dissemination will interfere with a fair trial and which relates to" evidence, the credibility of witnesses, or opinions on the merits of a claim or defense. 28 C.F.R. § 50.2(c).

Plaintiff alleges that defendants "have knowingly, willfully, and maliciously violated" these provisions, which are designed to "prohibit[] public disclosures that have injured" plaintiff. Am. Compl. ¶ 76. This claim must fail, however, because there is no private right of action under this regulation. *See Hatfill*, 404 F. Supp. 2d at 120-21. By its own terms, 28 C.F.R. § 50.2 is an expression of agency policy setting forth "specific guidelines for the release of . . . information" by DOJ personnel to news media in criminal and civil cases. *Id.* § 50.2(a). "Absent a clear indication of congressional intent to create a private right of action for the enforcement of this regulation, the Court can not [sic] impose one." *Hatfill*, 404 F. Supp. 2d at 121.

### III.  CONCLUSION

Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted and, accordingly, defendants' motion to dismiss will be granted. An Order accompanies this Memorandum Opinion.

DATE: August 17, 2012                                         COLLEEN KOLLAR-KOTELLY
                                                              United States District Judge